# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BUFFALO FIELD CAMPAIGN<br>14365 Hebgen Lake Road<br>West Yellowstone, MT 59758<br><br>FRIENDS OF ANIMALS<br>777 Post Road, Suite 205<br>Darien, CT 06820<br><br>WESTERN WATERSHEDS PROJECT<br>126 S. Main Street, Suite B2<br>Hailey, ID 83333<br><br>　　　　Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, in his official<br>capacity as the Secretary of the Interior,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>U.S. FISH AND WILDLIFE SERVICE, an<br>agency of the United States<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1. Millions of bison once roamed the entire North American plains, but today bison are nearly extinct from their historical range and most of the few thousand left in the wild live in or near Yellowstone National Park. The Yellowstone bison are the only significant herd of bison with no evidence of hybridization with cattle, thus representing a genetically important population. The Yellowstone bison are imperiled by overutilization

from hunting, restrictions in their range due to historical loss, livestock grazing, infrastructure and development, and climate change.

2. Plaintiffs Buffalo Field Campaign, Friends of Animals, and Western Watersheds Project bring this action against Defendants David Bernhardt and the United States Fish and Wildlife Service (FWS) to force them to carry out their duties under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq*. Defendants have failed to comply with their mandatory duties to conduct a proper 90-day finding on the Petitions to list the Yellowstone bison as an endangered or threatened Distinct Population Segment ("DPS") of plains bison, *Bison bison bison*. This lawsuit seeks to force Defendants to make a 90-day finding on a petition to list the bison that was submitted to FWS more than four (4) years ago.

3. Defendants' failure to make a 90-day finding violates the ESA and is arbitrary, capricious, and contrary to law within the meaning of the Administrative Procedure Act (APA). 5 U.S.C. §§ 701-06. Defendants' failure to fulfill their duties under the ESA places the Yellowstone bison in further peril, subjecting them to human exploitation and possible extinction.

4. To remedy Defendants' violations of law, Plaintiffs seek declaratory and injunctive relief requiring Defendants comply with the ESA and conduct a proper 90-day finding on the Petitions.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. §§ 1540(c) and (g) (action arising under the ESA and citizen suit provision).

6. This Court has authority to grant Plaintiffs' requested relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, 16 U.S.C. § 1540(g) (ESA), and 5 U.S.C. §§ 701-06 (APA).

7. Pursuant to the ESA citizen suit provision, Plaintiffs sent Defendants notice of its intent to sue ("Notice") on February 20, 2019. *See* 16 U.S.C. § 1540(g)(2).

8. Defendants received Plaintiffs' Notice on February 28, 2019.

9. More than sixty (60) days have passed since Defendants received Plaintiffs' Notice. *See id.*

10. Defendants have not remedied their violations of the ESA by conducting the overdue proper 90-day finding on the Petitions to list the Yellowstone bison. Therefore, an actual controversy exists between the parties within the meaning of the Declaratory Judgment Act. 28 U.S.C. § 2001.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, and Defendants maintain offices within jurisdiction of this Court.

**PARTIES**

12. Plaintiff, BUFFALO FIELD CAMPAIGN ("BFC"), is a not-for-profit regional conservation organization that is incorporated and headquartered in the state of Montana. The mission of BFC is to stop the harassment and slaughter of America's last wild bison, advocate for their lasting protection, protect the natural habitat of wild free-roaming bison and native wildlife, and work with people of all Nations to honor the sacredness of the wild bison. BFC's board members, volunteers, supporters, and staff are injured by Defendants' failure to make a proper 90-day finding, which prevented a 12-month conservation status review of the Yellowstone bison, a necessary step in listing the species under the ESA. Central to BFC's purpose is the daily operation of volunteer patrols along the bison's migration corridors during the fall, winter, and spring. BFC's volunteers' direct field experience fosters relationships with the bison and its habitat, which in turn, inspires volunteers to return to the field campaign and become advocates for the bison and the

habitat upon which they depend. Without ESA protection, the government will continue to harm and destroy the Yellowstone bison in its original range and habitat, and the species' habitat will continue to decline and be at risk of loss to further development. Defendants' refusal to conduct a proper 90-day finding on the Petitions to list the Yellowstone bison under the ESA injures BFC's board members, volunteers, supporters, and staff.

13. Plaintiff, FRIENDS OF ANIMALS, is a not-for-profit international advocacy organization incorporated in the state of New York since 1957. Friends of Animals seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living and domestic animals. Friends of Animals engages in a variety of advocacy programs in support of these goals. Friends of Animals informs its members about animal advocacy issues as well as the organization's progress in addressing these issues though its magazine called *Action Line*, its website, and other reports. Friends of Animals has published articles and information advocating for the protection of wildlife species so that they can live unfettered in their natural habitats. In the absence of proper protection under the ESA, Yellowstone bison are subject to habitat destruction and curtailment, as well as roundups, capture, and culling that prevent them from roaming freely throughout their range. Defendants' failure to make a proper 90-day finding on the Petitions to list the Yellowstone bison under the ESA injures Friends of Animals' members and staff.

14. Plaintiff, WESTERN WATERSHEDS PROJECT, is a regional not-for-profit conservation organization headquartered in Hailey, Idaho, with offices in Montana, Wyoming, Idaho, Arizona, California, and Oregon. The mission of Western Watersheds Project is to protect and restore watersheds and wildlife habitats on the nation's public lands through education, scientific study, public policy initiatives, and litigation. Without protection under the ESA, the natural habitat of the Yellowstone bison continues to be destroyed and used for cattle grazing, while Yellowstone bison are prevented from living in

the entirety of their natural range. Defendants' failure to make a proper 90-day finding on the Petitions to list the Yellowstone bison under the ESA injures Western Watershed Project's members and staff.

15. Plaintiffs sue on behalf of themselves and on behalf of their adversely affected members and supporters. Plaintiffs have invested time and resources to protect bison, including advocating for the conservation of the species and the Yellowstone population segment, and advocating for FWS to list the Yellowstone bison as threatened or endangered under the ESA. In addition, Plaintiffs work to educate their members, supporters, and the public about the status of the species and the threats it faces.

16. Plaintiffs have members and supporters who live near or frequently visit Yellowstone bison habitat in and around Yellowstone National Park. They use public land in and around Yellowstone for recreational pursuits such as camping, hiking, wildlife viewing, photography, and aesthetic enjoyment. These members seek to view Yellowstone bison throughout their range, and Defendants' failure to make a 90-day finding on the Petitions interferes with members' opportunities to do so. In addition to causing irreparable ecological harm to much of the Yellowstone bison's natural habitat, the failure to conduct a 90-day finding and delay ESA protections for Yellowstone bison will cause direct injury to the aesthetic, recreational, scientific, conservation, educational, and cultural interests that the plaintiff organizations and their members maintain in the continued existence, observation, and study of bison.

17. Defendants' failure to comply with federal law and refusal to make a proper 90-day finding on the Petitions to list the Yellowstone bison as a protected DPS has already and currently is causing adverse and irreparable injury to Plaintiffs, their members, and supporters aesthetic, cultural, recreational, educational, and other interests. Plaintiffs' injury will continue unless this Court grants the requested relief. Plaintiffs' injuries are actual, concrete injuries caused by Defendants' failure to comply with the ESA and its

implementing regulations and policies. This Court could redress these injuries by granting Plaintiffs' requested relief in this Complaint.

18. Defendant, DAVID BERNHARDT, in his capacity as Secretary of the United States Department of Interior, has ultimate responsibility for the implementation of the ESA, through the FWS, with respect to terrestrial species such as the Yellowstone bison. The Secretary is also responsible for the actions of his delegate, the FWS, including that delegate's refusal to conduct a 90-day finding. Plaintiffs sue Defendant Bernhardt in his official capacity.

19. Defendant, the UNITED STATES FISH AND WILDLIFE SERVICE, is a federal agency within the Department of the Interior. In this case, the Secretary of the Interior has delegated his responsibilities to the FWS. FWS is responsible for implementing and administering the ESA with respect to terrestrial wildlife such as Yellowstone bison.

**STATUTORY AND REGULATORY FRAMEWORK OF THE ENDANGERED SPECIES ACT**

20. In drafting the ESA, Congress found that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation," and that "other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. §§ 1531(a)(1) and (2). Accordingly, Congress passed the ESA to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." *Id*. § 1531(b).

21. To this end, the ESA requires FWS to list species of plants and animals that are facing extinction as "threatened" or "endangered" and to designate protected "critical habitat" for each listed threatened or endangered species. *Id*. § 1533(a). Under the statutory definition, a species is "endangered" if it "is in danger of extinction throughout all

or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" under the statute if it is "likely to become an endangered species in the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

22. For the ESA to protect a species and its habitat, FWS must first officially list the species as "endangered" or "threatened." *Id*. § 1533(a). The listing process is the critical first step in the ESA's system of species' protection and recovery. FWS must also designate the species' habitat as "critical habitat" for it to receive several important ESA protections. *Id.* § 1533(a)(3)(A)(i), *see also* § 1533(b)(6)(C).

23. The FWS must list a species under the ESA if it is threatened or endangered by any one or more of the following factors:

> (A)  the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B)  overutilization for commercial, recreational, scientific, or educational purposes;
> (C)  disease or predation;
> (D)  the inadequacy of existing regulatory mechanisms; or
> (E)  other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1)

24. FWS's discretion in deciding whether to list a species is limited solely to consideration of these five factors. In considering these factors, FWS must make its determinations only on the basis of "the best available scientific and commercial information regarding a species' status, without reference to possible economic or other impacts of such determination." 50 C.F.R. § 424.11(b); 16 U.S.C. § 1533(b)(1)(A).

25. Under the ESA, FWS may list a vulnerable distinct population segment (DPS) of a vertebrate species for protection even if FWS would not consider the species as a whole threatened or endangered. The independent listing of a threatened DPS is intended to be a preemptive measure to "protect and conserve species and the ecosystems upon which they depend before largescale decline occurs that would necessitate listing a species

or subspecies throughout its entire range." Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

26. Any interested person can initiate the listing process by filing a petition to list a species with FWS. 16 U.S.C § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

27. Upon receipt of such a petition, the ESA requires FWS to make an initial finding known as a "90-day finding." Specifically, within 90 days of receipt, "to the maximum extent practicable," FWS must determine "whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). FWS's implementing regulations define "substantial information" as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted." 50 C.F.R. § 424.14(b).

28. At the 90-day finding stage, FWS does not "subject the petition to critical review." Endangered and Threatened Wildlife and Plaints; 90-Day Finding for a Petition to List the Kennebec River Population of Anadromous Atlantic Salmon as Part of the Endangered Gulf Of Maine Distinct Population Segment, 71 Fed. Reg. 66298, 66298 (Nov. 14, 2006). "A petition need not establish a 'strong likelihood' or a 'high probability' that a species is either threatened or endangered to support a positive 90-day finding." Endangered and Threatened Wildlife; Notice of 90-Day Finding on a Petition to List the Caribbean Electric Ray as Threatened or Endangered Under the Endangered Species Act (ESA), 79 Fed. Reg. 4877, 4478 (Jan. 30, 2014).

29. If FWS finds that the petition presents substantial information (a "positive 90-day finding"), FWS must publish its finding in the Federal Register and "shall promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A).

30. In the case of a positive 90-day finding, FWS has 12 months from the date that the petition was received to make one of three findings: (1) the petitioned action is not warranted; (2) the petitioned action is warranted; or (3) the petitioned action is warranted but presently precluded by other pending proposals to list species of higher priority, provided that FWS is making expeditious progress in listing other species. 16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. § 424.14(b)(3).

31. If FWS makes a 12-month finding that the petitioned action is warranted, then it must publish a proposed rule to list the species as endangered or threatened in the Federal Register. 16 U.S.C. § 1533(b)(5). Within one year of the publication of a proposed rule to list a species, FWS must make a final decision on the proposal, *Id.* § 1533(b)(6)(A), or extend the deadline by up to six months in cases of scientific uncertainty. *Id.* § 1533(b)(6)(B)(i).

32. The ESA makes it unlawful for any person to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect a listed species, or attempt to engage in any of the foregoing actions, unless the action is specifically permitted by a special rule or permit issued by the Secretary. *Id.* §§ 1538–39. The ESA also requires that all federal agencies "carry out programs for the conservation" of threatened and endangered species and consult with the Secretary to ensure that their actions are "not likely to jeopardize the continued existence" of such species or "result in the destruction or adverse modification" of their critical habitat. *Id.* §§ 1536(a)(1), (2).

///
///
///

**FACTS GIVING RISE TO PLAINTIFFS' CLAIMS**

**A.      Yellowstone Bison.**

33.     The bison holds a position of paramount importance in American culture and history, as recognized by its recent designation as the National Mammal of the United States.

34.     Bison have persisted in North America since the last ice age. They are the largest land animals in the United States, with adult males weighing up to, and sometimes exceeding, 2,000 pounds.

35.     Bison play an important keystone role in the ecosystems of the Great Plains and American West. Unlike livestock that are confined to one area, mowing it to a uniform height, bison move continuously as they graze. This patchy grazing pattern leaves behind a mosaic of grass heights and habitat structures that provides nesting cover for many prairie-dwelling birds and supports a diversity of plant and animal life. Bison's "wallowing" behavior, in which they roll around and pack down the soil in depressions in the ground, creates natural water pools in the wallows that support a diversity of amphibian life across the landscape. Without bison wallows to hold water at the surface, amphibian habitat would be limited to naturally occurring ponds and streams. In winter, bison's large heads and shoulders allow them to carve paths through deep snow that are then used as corridors for other animals, including antelope and elk.

36.     Bison were once abundant throughout all of the continental United States and Canada, and their estimated population was 30–60 million prior to westward colonial expansion in the 18th and 19th centuries. But by the early 1800s, bison were driven to extinction west of the Rocky Mountains and east of the Mississippi River. By the turn of the 20th century, their population consisted of merely 500 total animals, with 25 individuals persisting in the Pelican Valley of Yellowstone National Park.

37. The Yellowstone bison population is regarded as the last remaining population of genetically intact bison in North America. It is one of the few bison populations in which no evidence has been found of introgression of cattle DNA, and it is the only known herd in the United States to have even partially persisted in its original habitat in the wild.

38. The Yellowstone bison are unique among other extant conservation herds in that they still exhibit migratory behavior. A significant portion of crucial winter range for the Yellowstone bison is located west and north of Yellowstone National Park outside Park boundaries.

39. The Yellowstone bison population consists of at least two geographically and genetically distinct subpopulations—the Central range herd and the Northern range herd.

40. The Northern range herd generally ruts in the Lamar Valley and Mirror Plateau and migrates in the winter to the northern Park boundary in the vicinity of Gardiner. The Central range herd roams between Pelican Valley, Hayden Valley, Mary Mountain, Firehole River Basin, and Madison Junction, and migrates to winter ranges beyond the west and north boundaries of Yellowstone National Park.

41. The existence of this population substructure contributes to the maintenance of overall genetic diversity within the Yellowstone bison population.

42. Disproportionate culling of the genetically distinct subpopulations threatens the viability of the Yellowstone bison as a whole through the loss of unique genetic qualities and genetic diversity.

43. During winter months, migratory Yellowstone bison are captured and killed at the Park's boundaries. Once they leave the Park, they may be killed by hunters and are culled by Montana state agencies in accordance with the Interagency Bison Management Plan (IBMP).

44. While bison killed at the western Park boundary in the vicinity of West Yellowstone come from the Central subpopulation, those killed at the northern Park boundary in the vicinity of Gardiner may originate from either the Central or Northern subpopulation.

45. It is not possible to differentiate between or separate bison from the Central and Northern range herds at the northern Park boundary without using invasive methods such as permanent identification markers or on-site genetic analysis.

46. Because bison from the Central range herd are killed at both the western and northern Park boundaries, the Central subpopulation is disproportionately impacted by hunting.

47. As a result of culling and hunting, between 2011 and 2014, the Northern subpopulation increased by 1,200 (an increase of 52%), while the Central subpopulation remained the same.

48. In order to avoid inbreeding depression and maintain genetic variation, each subpopulation should have an "effective population" of 1,000 bison, which translates to an overall subpopulation size of 2,000 to 3,000 bison.

49. Available information indicates that the size of the Northern range herd is marginal and that the Central range herd is below an effective population size of 1,000.

50. Between 2005 and 2014, the Central range herd declined from 3,531 to 1,400 bison, or by roughly 60%.

51. The IBMP currently dominates bison management within Yellowstone National Park and beyond, on National Forest system lands. The IBMP's managing body is comprised of an amalgam of government agencies with differing purposes and mandates: the National Park Service, U.S. Forest Service, U.S. Department of Agriculture Animal and Plant Health Inspection Service, Montana Department of Livestock, and Montana Department of Fish, Wildlife and Parks.

12

52. The IBMP was first adopted in the year 2000 after a legal dispute between the state of Montana, the U.S. Department of Agriculture, and the National Park Service regarding the impact of bison management on maintaining Montana cattle producers' "brucellosis-free" status.

53. A primary purpose of the IBMP is to address the risk of brucellosis transmission from bison to domestic livestock to protect the economic interests of the livestock industry in the state of Montana.

54. Under the IBMP, bison are intensively managed to protect against the perceived threat of brucellosis from bison, though no cases of such transmission to cattle have ever been documented in the field.

55. There is no comparable management plan for elk, a native species that harbors brucellosis and yet freely roams the same range where bison are destroyed, despite elk being implicated in transmitting brucellosis to cattle.

56. The IBMP intentionally halts the migrations of Yellowstone bison and subjects them to pressures of artificial selection and domestication. Actions undertaken through the IBMP include: hunting Yellowstone bison, capturing migratory Yellowstone bison for slaughter, permanently removing Yellowstone bison to quarantine facilities, and hazing Yellowstone bison off their habitat on federal, state, and private land.

57. The IBMP authorizes the annual culling of the Yellowstone bison population through both hunting outside of the Park and capturing migratory bison at the Park boundaries for slaughter.

58. The population thresholds set forth in the IBMP, which serve as triggers for culling, were not based on a population viability analysis, and do not account for the population substructure of the Yellowstone bison.

**B.     The Petitions to List the Yellowstone Bison.**

59.     On November 13, 2014, Western Watersheds Project and Buffalo Field Campaign submitted a petition to Defendants to list the Yellowstone bison as a threatened or endangered DPS under the ESA.

60.     On March 2, 2015, Defendants received a second petition from Mr. James A. Horsley requesting that FWS list the Yellowstone bison as threatened or endangered under the ESA.

61.     The Petitions presented evidence that the Yellowstone bison may be threatened or endangered because its habitat and range has historically been, and continues to be, destroyed, modified, and curtailed.

62.     The Petitions presented evidence that the range of the Yellowstone bison spans an area of approximately 20,000 km$^2$ within and surrounding the northern Greater Yellowstone Area, but that Yellowstone bison herds are restricted to the use of a 3,175 km$^2$ habitat within the Park, a mere 15% of their historic range.

63.     The Petitions presented evidence that in many years, the Yellowstone bison seasonally attempt to occupy their historic range and migratory routes that stretch beyond the human-defined Park boundaries, but that the bison are prevented from doing so because they are hazed back into the Park or killed in accordance with the IBMP to prevent them from accessing their historic habitat, which is used for cattle grazing.

64.     The Petitions presented evidence that the prioritization of the use of public lands surrounding Yellowstone National Park as cattle grazing allotments rather than as bison habitat is a present, continuous, and ongoing threat that may endanger the survival and genetic integrity of the Yellowstone bison population.

65.     The Petitions provided information that continued culling may degrade the viability of the Yellowstone bison through the loss of genetic heterogeneity and loss of ability to migrate.

66. The Petitions presented scientific information that continued culling may lead to loss of migratory behavior, which in turn may reduce the overall health and resilience of the Yellowstone bison.

67. The Petitions documented that culling can have a differential effect on the Yellowstone bison subpopulations.

68. The Petitions provided evidence that indiscriminate hunting and culling are impacting the ability of the Yellowstone bison to maintain effective subpopulation sizes in at least two ways. First, IBMP culling has disproportionately impacted the Central and Northern subpopulations. Second, IBMP management practices have brought about adverse demographic changes including differential impacts on cows and bulls and loss of family groups.

69. The Petitions presented evidence that the Yellowstone bison may be threatened or endangered due to the hunting of Yellowstone bison between fall and spring in the Gardiner Basin area north of the Park and Hebgen Basin area west of the Park.

70. The Petitions presented evidence that the Yellowstone bison may be threatened or endangered due to culls authorized by the IBMP using capture facilities at the northern and western borders of the Park.

71. The Petitions presented evidence that the genetic compositions of the Yellowstone bison subpopulations are being altered by the IBMP's selective culling of bison, which may in turn reduce the health, resilience, and defining characteristics of the herds.

72. The Petitions presented evidence that the Yellowstone bison's Central subpopulation falls significantly short of an effective population size of 1,000, and that the Northern subpopulation is marginal based on the definition of an effective population size.

73. The Petitions documented that the IBMP has neglected to conduct a population viability study for the Yellowstone bison to determine the probability of extinction, despite its designation as a high priority research need.

74. The Petitions presented substantial evidence that the Yellowstone bison may be threatened or endangered as a result of the inadequacy of existing regulatory mechanisms.

75. The IBMP is the major regulatory mechanism for managing the Yellowstone bison in Montana.

76. The Petitions presented evidence that the IBMP is a mechanism designed to keep bison out of their habitat inside and beyond the Park (both by physically halting their migration and by keeping their populations sufficiently low so as to reduce the number of possible out-of-park migrants) and may threaten or endanger the population.

C.   **Litigation Regarding Negative 90-Day Bison Finding**

77. Despite the vast information the Petitions provided supporting ESA protections for Yellowstone bison, on January 12, 2016, FWS published a negative 90-day finding in response to the Petitions. Endangered and Threatened Wildlife and Plants; 90-Day Findings on 17 Petitions, 81 Fed. Reg. 1368-75 (Jan. 12, 2016).

78. On September 26, 2016, Petitioners filed suit in the U.S. District Court for the District of Columbia challenging this decision on several grounds, including that FWS had applied an incorrect legal standard in evaluating the petition under Section 4 of the ESA. *See Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103 (D. D.C. 2018). *See Buffalo Field Campaign v. Zinke*, 0:16-cv-01909 (D.D.C.).

79. On January 31, 2018, U.S. District Judge Christopher R. Cooper, issued a decision granting in part Petitioners' Motion for Summary Judgment in that action. *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103 (D. D.C. 2018). Judge Cooper found that FWS had indeed "applied an improper standard when evaluating [the] petition," and, thus acted

16

arbitrary and capriciously in issuing the negative 90-day finding. *Id*. at 105. Accordingly, the court remanded "the case for the agency to conduct a new 90-day finding using the proper standard." *Id*.

80. FWS subsequently dismissed an appeal of the district court's decision granting summary judgment to Petitioners. *See* Dismissal Order, No. 18-5087 (D.C. Cir. June 27, 2018).

## CLAIM FOR RELIEF

**(Defendants' Failure to Conduct a Proper 90-Day Finding on the Petitions Violates the Endangered Species Act and is Otherwise Arbitrary and Capricious)**

81. Plaintiffs herein incorporate all information and allegations contained in the preceding paragraphs.

82. The ESA required Defendants to make a 90-day finding on the Petitions to list the Yellowstone bison DPS. 16 U.S.C. § 1533(b)(3). Since FWS never properly made a 90-day finding, Defendants were required to complete this listing by February 12, 2015. Defendants have been in violation of this express statutory command for years.

83. Defendants' failure to comply with the mandate of the ESA continues to cause injury to Plaintiffs' interests in the use and enjoyment of the Yellowstone bison and its habitat.

84. The duty to issue a 90-day finding on the Yellowstone bison Petitions is a non-discretionary duty within the meaning of the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1)(C).

85. Defendants' failure to make a proper 90-day finding for the Yellowstone bison constitutes a failure to perform a non-discretionary duty under the ESA, is contrary to the mandatory provisions of the ESA and its implementing regulations, and constitutes agency action that has been "unlawfully withheld and unreasonably delayed," within the meaning of the APA, 5 U.S.C. § 706(1).

86.     Plaintiffs have no other adequate remedy at law to redress the violations noted above.

87.     Unless enjoined and made subject to a declaration by this Court, Defendants will continue to violate their mandatory duties under the ESA to conduct a proper 90-day finding for the Yellowstone Bison.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment providing the following relief:

1. Declare that Defendants violated the ESA and APA by failing to make a 90-Day Bison Finding on the Petitions to list the Yellowstone bison as threatened or endangered;

2. Order Defendants to make, by a certain date, a 90-day finding on the Petitions to list the Yellowstone Bison as a threatened or endangered DPS, and to publish, by a certain date, such finding in the Federal Register;

3. Award Plaintiffs' its costs of litigation, including reasonable attorneys' fees under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(4), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4. Grant Plaintiffs such other relief as the Court deems just and proper.

Dated: May 15, 2019                                    Respectfully Submitted,

/s/ Michael Ray Harris
Michael Ray Harris (DC Bar # CO0049)
Director, Wildlife Law Program
Friends of Animals
Western Region Office
7500 E. Arapahoe Rd., Suite 385
Centennial, CO 80112
720-949-7791
michaelharris@friendsofanimals.org